**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
MARIE A. MCCRARY (State Bar No. 262670)
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOLLY BROWN, ADINA RINGLER, and CHRISTIAN LEMUS, as individuals, on behalf of themselves, the general public and those similarly situated, | CASE NO. |
| Plaintiffs, | CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING; FRAUD, DECEIT, AND/OR MISREPRESENTATION; UNFAIR BUSINESS PRACTICES; AND UNJUST ENRICHMENT |
| v. | |
| KELLOGG COMPANY, | JURY TRIAL DEMANDED |
| Defendant. | |

-1-

**INTRODUCTION**

1. Plaintiffs Molly Brown, Adina Ringler, and Christian Lemus, by and through their counsel, bring this class action against Defendant Kellogg Company to seek redress for Defendant's deceptive practices in labeling and marketing its products under the MorningStar Farms, Special K, RX, and Bear Naked brands.

2. Consumers are increasingly health conscious and, as a result, many consumers seek foods high in protein. To capitalize on this trend, Defendant prominently labels the front of its products as providing specific amounts of protein per serving depending on the product, such as "16G PROTEIN" on the label of the MorningStar Farms Veggie Burger Grillers Original product. Consumers, in turn, reasonably expect that each product will provide the actual amount of protein per serving that the front of the product package claims it will.

3. In truth, however, Defendant's products do not deliver the amount of protein that the labels claim. Based on amino acid content testing, Defendant's products contain less protein than claimed, meaning, for example, rather than containing 16 grams of protein per serving, the MorningStar Farms Veggie Burger Grillers Original product actually contain only 10.58 grams (i.e., an overstatement by approximately 51%).

4. Further, Defendant uses proteins of low biological value to humans in their products, such as wheat and oat proteins. Accordingly, when the protein content is adjusted for poor quality based the FDA mandated "Protein Digestibility Corrected Amino Acid" score ("PDCAAS"), Defendant's products provide even less protein per serving than amino acid content testing alone reveals. Wheat protein typically has a PDCAAS score of between 0.3 and 0.4, meaning only 30-40% of the protein from those sources will be digested and available to humans. Oat protein typically has a PDCASS score of between .45 and .51.

5. Defendant's misrepresentations and misbranding caused Plaintiffs and members of the class to pay a price premium for the products.

**PARTIES**

6.    Molly Brown is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Novato, California (Marin County).

7.    Adina Ringler is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Northridge, California.

8.    Christian Lemus is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Santa Ana, California.

9.    Molly Brown, Adina Ringler, and Christian Lemus are referred to hereafter as "Plaintiffs."

10.   Defendant Kellogg Company ("Defendant") is a corporation existing under the laws of the State of Delaware, having its principal place of business in Michigan.

**JURISDICTION AND VENUE**

11.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

12.   The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

13.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14.   In accordance with California Civil Code Section 1780(d), Molly Brown concurrently files herewith a declaration establishing that, at various times throughout the class period, she purchased the following products: MorningStar Veggie Burger Grillers Original, MorningStar Popcorn Chik'n, MorningStar Chorizo Crumbles, MorningStar Grillers Prime

Veggie Burgers, MorningStar Garden Veggie Burger, MorningStar Grillers Veggie Crumbles, MorningStar Buffalo Chik'n Patties, MorningStar Chik'n Strips, MorningStar Veggie Meatballs, MorningStar Breakfast Veggie Sausage Links, MorningStar Veggie Classics Frozen Buffalo Wings, MorningStar Incogmeato 100% Plant Protein Plant-Based Ground, RX Protein Bars, Special K Protein Original Cereal, and Bear Naked Honey Almond Granola in Marin County, California. (Plaintiffs Molly Brown's declaration is attached hereto as Exhibit A.)

15.     Plaintiffs accordingly alleges that jurisdiction and venue are proper in this Court.

### SUBSTANTIVE ALLEGATIONS

16.     Defendant manufactures, distributes, markets, advertises, and sells a variety of meat substitutes, cereals, bars, shakes, and granola in the United States under its brand names "MorningStar Farms," "Special K," "Rx," and "Bear Naked" (collectively referred to herein as "Kellogg brand"). Many of these products have packaging that predominately, uniformly, and consistently states on the principal display panel of the product labels that the products contain and provide a certain amount of protein per serving. Plaintiffs have attached as Exhibit B a non-exhaustive list of the Kellogg brand products that make protein claims on the front of the product packages. The products listed in Exhibit B, and any other Kellogg brand product that claims a specific amount of protein on the front of its label, will hereinafter be referred to as the "Products."

17.     The representation that the Products contain and provide a specific amount of protein per serving was uniformly communicated to Plaintiffs and every other person who purchased any of the Products in California and the United States. The same or substantially similar product label has appeared on each Product during the entirety of the Class Period in the general form of the following examples:



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28







18.     As described in detail below, Defendant's advertising and labeling of the Products as containing and providing specific amounts of protein per serving is false, misleading, and intended to induce consumers to purchase the Products at a premium price, while ultimately failing

to meet consumer expectations. These representations deceive and mislead reasonable consumers into believing that a serving of the Products will provide the grams of protein as represented on the label, when in fact, they contain less protein. For example, protein content testing for the MorningStar Farms Veggie Grillers Original product revealed that a serving contains only 10.58 grams of protein – an overstatement by approximately 51%. Further, when correcting for the digestibility (and therefore bio-usability) of the protein through PDCAAS, the amount provided will be even less since the Products rely on low quality proteins such as wheat protein.

**Consumer Demand for Protein**

19.     Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely rely upon nutrition information when selecting and purchasing food items. This is especially true in the community of athletes, registered dietitians, and coaches, to which Defendant markets. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Indeed, the FDA recommends relying on Nutrition Facts Labels as the primary tool to monitor the consumption of protein.[1]

20.     Protein is found throughout the body—in muscle, bone, skin, hair, and virtually every other body part or tissue. The health benefits of protein are well studied and wide ranging. Scientific studies have confirmed that protein can assist in weight loss, reduce blood pressure, reduce cholesterol, and control for risk factors for cardiovascular diseases. The National Academy of Medicine recommends that adults get a minimum of .8 grams of protein for every kilogram of body weight per day, or just over 7 grams for every 20 pounds of body weight.[2] For a 140-pound person, that means about 50 grams of protein each day. For a 200-pound person, that means about 70 grams of protein each day.

---

[1] FDA Protein Fact Sheet, https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/factsheets/Protein.pdf

[2] National Academies of Medicine. *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients).*

21.     Athletes and fitness enthusiasts typically consume much higher amounts of protein each day; typically between 1 to 1.5 grams of protein for every pound of body weight.

22.     The health benefits of protein are just as important, if not more important, for children. Children are in a relative state of constant growth and rely on protein as the building block of muscle, bone, skin, hair, and virtually every other body part or tissue. The National Academies of Science recommends the following amounts of daily intake of protein based on age group: 1-3 years old: 13 g of protein per day; 4-8 years old: 19 g of protein per day; 9-13 years old: 34 g of protein per day.[3]

23.     Protein *quantity* by itself does not tell the full story from a human nutritional standpoint. A protein's *quality* is also critical because, as explained below, humans cannot fully digest or utilize some proteins.  As the FDA has stated in published guidance: "Information on protein quantity alone can be misleading on foods that are of low protein quality" as a result, "nutrition labeling must allow consumers to readily identify foods with particularly low quality protein to prevent them from being misled by information on only the amount of protein present." 58 Fed. Reg. 2079 at 2101-2.

24.     Protein is not a monolithic substance, but instead comes in many varieties. Proteins are chains of different amino acids, and different types of amino acids chained together in different ways will make different types of proteins. Further, the makeup of the protein that is ingested changes the function of the protein in the body, and certain types of proteins are more easily digested and used by humans than others.

25.     All of a human body's proteins are formed through the process of protein synthesis. That is, although humans consume dietary proteins, their bodies digest those proteins, break them down into their constituent amino acids, and then use those amino acids to synthesize the human proteins necessary for life, tissue repair, and other functions.  Of the twenty total amino acids, humans can produce only eleven of them on their own. Humans cannot produce, under any circumstances, nine of the amino acids required for protein synthesis. These nine amino acids are

---

[3] *Id.*

Class Action Complaint

called the "essential amino acids" and they must be supplied through the diet. All nine essential amino acids are necessary for protein synthesis to take place.

26.     Lacking even one essential amino acid will prevent protein synthesis from occurring, and the rest of the proteins will degrade into waste. Accordingly, once the body uses up the limiting essential amino acid from a protein source, the remainder of that protein becomes useless to human protein synthesis and has little nutritional value. High-quality proteins, therefore, are those that contain all nine essential amino acids because they have a greater effect on protein synthesis and are fully digestible. A dietary protein containing all of the essential amino acids in the correct proportions is typically called a "complete protein."

27.     A protein source's digestibility also affects the amount of useable protein a person receives from consuming it.  Many plant-based proteins are only 85% digestible, meaning 15% of the protein from that source will simply pass through the body without ever being absorbed at all. As the FDA has stated in official guidance, "Accurate methods for determining protein quality are necessary because different food protein sources are not equivalent in their ability to support growth and body protein maintenance." 56 Fed. Reg. 60366, § B. The Protein Digestibility Corrected Amino Acid Score ("PDCAAS") is the FDA mandated measure of protein quality, and it accounts for both the amino acid profile and the digestibility of the protein. 21 C.F.R. § 101.9(c)(7)(ii).

28.     The PDCAAS method requires the manufacturer to determine the amount of essential amino acids that the food contains and then multiply that number by humans' ability to digest the amino acid profile.

29.     Defendant uses plant-based proteins, such as wheat protein, in their products. Because of the differences in benefits depending on the amino acid composition of a protein, the source of protein is important. Whey protein is animal-based and contains all nine essential amino acids. It has a high biological value and is fully digestible by humans. Thus, whey protein has a PDCAAS of 1.0. Plant protein contains higher levels of antioxidants, but rarely contains all nine essential amino acids.  Further, plant proteins such as wheat proteins are not fully digested by

Class Action Complaint

humans. Wheat proteins typically have a PDCAAS of .3-.4, meaning only 30-40% of the protein from those sources will be digested and available to humans.

30.     By combining proteins with a 1.0 PDCAAS, such as whey, with lower quality proteins such as wheat that typically have .3 or .4 PDCAAS, the overall PDCAAS for the combination will be far lower than 1.0.

31.     Accordingly, Defendant's use of low quality proteins, even in combination with some higher quality proteins, means that they actually provide far less protein to humans than their labels claim, or that amino acid content testing without correcting for digestibility shows.

**Federal and State Regulations Governing Food Labeling**

32.     The Food and Drug Administration regulates nutrition content labeling. According to these regulations, "[a] statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value . . . *shall be given if a protein claim is made for the product . . .*" 21 C.F.R. 101.9(c)(7)(i) (emphasis added).

33.     Although FDA guidance provides that a declaration of the DRV for protein is "not mandatory" in typical circumstances, that same guidance is equally clear that "[t]he percent of the DRV is required if a protein claim is made for the product."[4]

34.     Further, FDA regulations require the DRV to be calculated using amino acid analysis, more specifically the Protein Digestibility Corrected Amino Acid Score ("PDCAAS"). 21 C.F.R. § 101.9(c)(7)(ii); FDA Food Labeling Guide, p. 29, Question N.22. The PDCAAS method does not calculate protein content by nitrogen combustion, which is otherwise permitted under 21 C.F.R. § 101.9(c)(7) for products that do not make protein content claims.[5]

35.     Accordingly, when a product makes a protein content claim, FDA regulations require manufacturers to calculate the amount of amino acids that the food contains and then multi-

---

[4] Guidance for Industry: A Food Labeling Guide ("FDA Food Labeling Guide") p. 29, Question N22, U.S. Food & Drug Administration, https://www.fda.gov/media/81606/download (last accessed February 18, 2020).
[5] Specifically, the regulation states that the grams of protein figure in the nutrition fact box "may be calculated on the basis of the factor of 6.25 times the nitrogen content of the food."

ply that amount by humans' ability to digest the amino acid profile (the PDCAAS) to come up with a percent daily value.

36.    Identical federal and California laws regulate the content of labels on packaged food and require truthful, accurate information on the labels of packaged foods. The requirements of the federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. §§ 101, 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursu- ant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, no state imposes dif- ferent requirements on the labeling of packaged food for sale in the United States.

37.    Under the FDCA, the term false has its usual meaning of "untruthful," while the term misleading is a term of art that covers labels that are technically true, but are likely to de- ceive consumers. Under the FDCA, if any single representation on the labeling is false or mis- leading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

38.    To implement the FDCA, the Food and Drug Administration (FDA) promulgated regulations, including regulations that govern nutrient content claims. A nutrient content claim is a claim that "expressly or implicitly characterizes the level of a nutrient." 21 C.F.R. § 101.13(b). "Express" nutrient content claims include any statement, outside the Nutrition Facts Panel, about the level of a nutrient. 21 C.F.R. 101.13(b)(1); 21 C.F.R. § 101.13(c). Stating information from the nutrition facts panel (such as grams protein per serving) elsewhere on the package necessarily constitutes a nutrient content claim. 21 C.F.R. § 101.13(c). Like labels generally, nutrient content claims in particular cannot be "false or misleading in any respect." 21 C.F.R. 101.13(i)(3).

39.    In addition to regulating nutrient content claims, FDA regulations require labels to include a Nutrition Facts Panel (NFP), 21 C.F.R. § 101.9, and that the NFP contain a statement of the number of grams of protein in a serving. 21 C.F.R. § 101.9(c)(7). The regulations permit a

manufacturer to compute the number of grams of protein for the NFP by relying on the nitrogen method of analysis as given in the "Official Methods of Analysis of the AOAC International." *Id.* Manufacturers are also permitted to rely on alternative methods. *Id*.

40.     Moreover, where a product makes a protein claim, it must include a percent daily value for the protein in the NFP using PDCAAS, a method that accounts for both the quantity and quality of protein in the product. 21 C.F.R. 101.9(c)(7)(i)-(ii). The first step is to calculate the "corrected amount of protein per serving" by multiplying protein quantity by PDCAAS, and then dividing that "corrected amount" by 50 grams (the "recommended daily value" for protein) to come up with a percent daily value. *Id.*

41.     While a required statement *inside* of the NFP escapes regulations reserved for nutrient content claims (21 C.F.R. § 101.13(c)), the identical statement *outside* of the NFP is still considered a nutrient content claim and is therefore subject to 21 C.F.R. § 101.13(i)(3). 21 C.F.R. § 101.13(c). Indeed, the Ninth Circuit has specifically held that "a requirement to state certain facts in the nutrition label is not a license to make that statement elsewhere on the product." *Reid v. Johnson & Johnson*, 780 F.3d 952, 960 (9th Cir. 2015). Thus, Defendant's protein representations on the front label are subject to analysis as a nutrient content claim and cannot be false or misleading in any manner.

42.     Defendant's protein representations on the front package are false and misleading because they broadly tout protein quantity while ignoring that the poor quality proteins in their products and the fact that their products will provide far less useable protein than claimed.  Indeed, the FDA has already stated in published guidance that such a practice is misleading. *See* 58 Fed. Reg. 2079 at 2101-2 "Information on protein quantity alone can be misleading on foods that are of low protein quality.").

43.     Further in addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations. *See* California Health & Safety Code § 110660 (misbranded if label is false and misleading); and California Health & Safety Code § 110705

(misbranded if words, statements and other information required by the Sherman Law are either missing or not sufficiently conspicuous).

44.     Under California law, a food product that is "misbranded" cannot legally be manufactured, advertised, distributed, sold, or possessed. Misbranded products have no economic value and are legally worthless.

45.     Representing that the Products contain a certain amount of protein per serving, as Defendant's labels do, is a statement of fact, and use of these phrases on the labels of packaged food is limited by the aforementioned misbranding laws and regulations.

**Defendant's Marketing and Labeling of its Products Violates State and Federal Food Labeling Laws**

46.     Defendant's Products are unlawful, misbranded, and violate the Sherman Law, California Health & Safety Code § 110660, *et seq.*, because the Products' labels state that each Product contains and provides a specific amount of protein per serving—such as "16G PROTEIN" for the MorningStar Farms Veggie Burger Grillers Original product—when, in fact, amino acid content testing reveals that the Products contain less – such as 10.58 grams of protein for the MorningStar Farms Veggie Burger Grillers Original product (an overstatement by approximately 51%).

47.     Defendant's marketing, advertising, and sale of the Products violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*), including but not limited to:

  a.  Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

  b.  Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

  c.  Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or

misleadingly advertised.

48.   Defendant's marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

d.   Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

e.   Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear food labeling is either missing or not sufficiently conspicuous);

f.   Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

g.   Section 110765, which makes it unlawful for any person to misbrand any food; and

h.   Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

49.   Defendant has violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including but not limited to 21 C.F.R. § 101.9 (c)(7), which have been incorporated by reference in the Sherman Law, by failing to include on their product labels the information required by law.

50.   A reasonable consumer would expect that the Products contain and provide what Defendant identifies them to contain and provide on the product labels and that the labels would not be contrary to the policies or regulations of the State of California and/or the FDA. For example, a reasonable consumer would expect that when Defendant labels its Products as containing "16G PROTEIN" per serving, as it claimed on the MorningStar Farms Veggie Burger Grillers Original product's label, the Products would provide 16 grams of protein per serving. However, based on amino acid content testing, Defendant's Products contain less. For example, the MorningStar Farms Veggie Burger Grillers Original product only contained 10.58 grams – an overstatement of approximately 51%.

51.     Moreover, based on the types of protein stated in the Products' ingredient lists, the amount of digestible or usable protein the Products actually deliver to the human body is even lower than the amino content testing itself reveals. Defendant uses poor quality proteins, such as wheat proteins, in the Products, which will result in each Product's overall PDCAAS being far less than 1.0.

52.     Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's food labeling claims, especially at the point of sale. Consumers would not know the true protein content of the Products merely by looking elsewhere on the product package. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that a serving of a Product does not contain the number of grams of protein that is represented on the label. An average consumer also lacks the specialized knowledge necessary to determine the PDCAAS for the Products. That combined with Defendant's active concealment in representing that the Products contain and provide specific amounts of protein per serving gave the average reasonable consumer no reason to suspect that Defendant's representations on the packages were false. Therefore, consumers had no reason to investigate whether the Products actually do contain and provide the amount of protein per serving that the labels claim they do. Thus, reasonable consumers relied on Defendant's representations regarding the nature of the Products.

53.     Defendant intends and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendant has done with the claims on that their Products that they contain and provide specific amounts of protein per serving.

**Defendant Misleadingly Markets Its Products to Increase Profits and Gain a Competitive Edge**

54.     In making false, misleading, and deceptive representations, Defendant distinguishes its Products from competitors' products. Defendant knew and intended that consumers would purchase, and pay a premium for, products labeled as having more protein over compara-

ble products that do not contain misleading protein representations on the product labels. By using this branding and marketing strategy, Defendant is stating that its Products are superior to, better than, and more nutritious and healthful than other products that do not misrepresent the number of grams of protein on their labels.

**Defendant Intends to Continue to Market its Products as Containing More Protein than the Products Actually Contain**

55.     Because consumers pay a price premium for products that contain more protein, by labeling their Products as containing more grams of protein per serving than they actually contain, Defendant is able to both increase their sales and retain more profits.

56.     Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of its Products while decreasing the sales of competitors that do not misrepresent the number of grams of protein contained in their products, and/or (ii) commanding a higher price for its Products because consumers will pay more for these Products due to consumers' demand for products containing more protein.

57.     The market for protein products is continuing to grow and expand, and because Defendant knows consumers rely on representations about the number of grams of protein in food products, Defendant has an incentive to continue to make such false representations. In addition, other trends suggest that Defendant has no incentive to change their labeling practices.

58.     For example, one market analysis revealed that between 2013-2017, product launches with a protein claim grew 31%.[6]

59.     To capitalize on the growing market, Defendant has since expanded its product line from veggie burgers to meat-free substitutes and other snacks and have continued to replicate their misrepresentations on the new product lines. Defendant continues to launch new product lines and flavors to diversify its portfolio to maintain its competitive edge, making it likely that Defendant will continue to misleadingly advertise its Products and perpetuate the misrepresentations regarding the protein in its Products.

---

[6] https://www.bakeryandsnacks.com/Article/2018/11/26/10-key-snack-trends-to-watch?utm_source=copyright&utm_medium=OnSite&utm_campaign=copyright

## PLAINTIFFS' EXPERIENCES

**Plaintiff Molly Brown**

60.     Ms. Brown has purchased the Products on multiple occasions from various Safe-way and Target stores throughout Marin County, California since July 2018. She purchased at least the following: MorningStar Veggie Burger Grillers Original, MorningStar Popcorn Chik'n, MorningStar Chorizo Crumbles, MorningStar Grillers Prime Veggie Burgers, MorningStar Garden Veggie Burger, MorningStar Grillers Veggie Crumbles, MorningStar Buffalo Chik'n Patties, MorningStar Chik'n Strips, MorningStar Veggie Meatballs, MorningStar Breakfast Veggie Sausage Links, MorningStar Veggie Classics Frozen Buffalo Wings, MorningStar Incogmeato 100% Plant Protein Plant-Based Ground, RX Protein Bars, Special K Protein Original Cereal, and Bear Naked Honey Almond Granola.

61.     Ms. Brown made each of her purchases after reading and relying on the truthfulness of Defendant's front of the product label that promised the Products contained a specified amount of protein per serving (such as "16G PROTEIN" per serving for the MorningStar Farms Veggie Burger Grillers Original product). But on each of the Products she purchased, Defendant misrepresented the protein content of the Products as containing more grams of protein than it actually contains, and as far more than it actually provides, when adjusted by the PDCAAS.

62.     At the time of each of her purchases of the Products, Ms. Brown did not know that the Products did not contain or provide the amount of protein represented on the label. As a result of Defendant's misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to her.

63.     Ms. Brown not only purchased the Products because the labels said that they contained a specified amount of protein per serving, but she also paid more money for the Products than she would have paid for other or a similar protein product that was not mislabeled regarding the number of grams of protein it contained.

64.     Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Ms. Brown would not have purchased them or, at a very minimum, she would have paid less for the Products.

65.     Ms. Brown continues to desire to purchase protein products, including those mar-

keted and sold by Defendant. If the Products were reformulated to provide the grams of protein

that are represented on the labels, Ms. Brown would likely purchase the Products again in the fu-

ture. Ms. Brown regularly visits stores where the Products and other protein products are sold.

Because Ms. Brown does not know the formula for Defendant's products and cannot test whether

or not the Products provide the amount of protein that is represented on the label, she will be un-

able to rely on Defendant's labels when shopping for protein products in the future absent an in-

junction that prohibits Defendant from labeling its products with the incorrect number of grams of

protein that each serving contains. Should Defendant begin to market and sell a new line of prod-

ucts, Ms. Brown could be at risk for buying another one of Defendant's products in reliance on

the same or similar misrepresentation.

**Plaintiff Adina Ringler**

66.     Ms. Ringler has purchased the Products on multiple occasions from various retail

stores, including Costco in Northridge, Target in Granada Hills, Ralph's in Porter Ranch, and

Sprouts in Granada Hills, since July 2018. She purchased at least the following Products: RX

Plant-Based Protein Bars (the Peanut Butter and Chocolate Chip flavors), Special K Keto-

Friendly Bars (the Chocolate Almond Fudge flavor), Special K Protein Meal Bars (the Chocolate

Peanut Butter flavor), and the Morningstar Farms Chik'n Patties (the Original and Buffalo fla-

vors).

67.     Ms. Ringler made each of her purchases after reading and relying on the truthful-

ness of Defendant's front of the product label that promised the Products contained a specified

amount of protein per serving (such as "PROTEIN 12g" per bar for the Chocolate Peanut Butter

Special K Protein Meal Bar product). But on each of the Products she purchased, Defendant mis-

represented the protein content of the Products as containing more grams of protein than it actu-

ally contains, and as far more than it actually provides, when adjusted by the PDCAAS.

68.     At the time of each of her purchases of the Products, Ms. Ringler did not know

that the Products did not contain or provide the amount of protein represented on the label. As a

result of Defendant's misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to her.

69.     Ms. Ringler not only purchased the Products because the labels said that they contained a specified amount of protein per serving, but she also paid more money for the Products than she would have paid for other or a similar protein product that was not mislabeled regarding the number of grams of protein it contained.

70.     Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Ms. Ringler would not have purchased them or, at a very minimum, she would have paid less for the Products.

71.     Ms. Ringler continues to desire to purchase protein products, including those marketed and sold by Defendant. If the Products were reformulated to provide the grams of protein that are represented on the labels, Ms. Ringler would likely purchase the Products again in the future. Ms. Ringler regularly visits stores where the Products and other protein products are sold. Because Ms. Ringler does not know the formula for Defendant's products and cannot test whether or not the Products provide the amount of protein that is represented on the label, she will be unable to rely on Defendant's labels when shopping for protein products in the future absent an injunction that prohibits Defendant from labeling its products with the incorrect number of grams of protein that each serving contains. Should Defendant begin to market and sell a new line of products, Ms. Ringler could be at risk for buying another one of Defendant's products in reliance on the same or similar misrepresentation.

**Plaintiff Christian Lemus**

72.     Mr. Lemus has purchased the Products on multiple occasions from various retail stores, including Costco in Tustin, California, Trader Joe's in Santa Ana, California, and Target in Santa Ana, California since July 2018. He purchased at least the following Products: RX Protein Bars, RX Oatmeal Cups, and Special K Cereal (Original).

73.     Mr. Lemus made each of his purchases after reading and relying on the truthfulness of Defendant's front of the product label that promised the Products contained a specified amount of protein per serving (such as "12 G. PROTEIN BAR" for the Peanut Butter RX Protein

Bars). But on each of the Products he purchased, Defendant misrepresented the protein content of the Products as containing more grams of protein than it actually contains, and as far more than it actually provides, when adjusted by the PDCAAS.

74.     At the time of each of his purchases of the Products, Mr. Lemus did not know that the Products did not contain or provide the amount of protein represented on the label. As a result of Defendant's misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to him.

75.     Mr. Lemus not only purchased the Products because the labels said that they contained a specified amount of protein per serving, but he also paid more money for the Products than he would have paid for other or a similar protein product that was not mislabeled regarding the number of grams of protein it contained.

76.     Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Mr. Lemus would not have purchased them or, at a very minimum, he would have paid less for the Products.

77.     Mr. Lemus continues to desire to purchase protein products, including those marketed and sold by Defendant. If the Products were reformulated to provide the grams of protein that are represented on the labels, Mr. Lemus would likely purchase the Products again in the future. Mr. Lemus regularly visits stores where the Products and other protein products are sold. Because Mr. Lemus does not know the formula for Defendant's products and cannot test whether or not the Products provide the amount of protein that is represented on the label, he will be unable to rely on Defendant's labels when shopping for protein products in the future absent an injunction that prohibits Defendant from labeling its products with the incorrect number of grams of protein that each serving contains. Should Defendant begin to market and sell a new line of products, Mr. Lemus could be at risk for buying another one of Defendant's products in reliance on the same or similar misrepresentation.

78.     Plaintiffs and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under California law and the products are misbranded; therefore, the Products are

worth less than what Plaintiffs and members of the Class paid for them and/or Plaintiffs and members of the Class did not receive what they reasonably intended to receive.

## CLASS ALLEGATIONS

79.     Plaintiffs brings this class action lawsuit on behalf of themselves and proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

> All persons in the State of California who purchased the Products between September 22, 2017 and the present.

80.     This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

81.     Numerosity: Plaintiffs do not know the exact size the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

82.     Common Questions Predominate: This action involves common questions of law and fact to the potential classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Products contained the amount of protein as represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

   a.   The true nature of the protein content in the Products;

   b.   Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive and/or unlawful because of misrepresentations;

   c.   Whether Defendant's actions violate Federal and California laws invoked herein;

d.  Whether labeling the Products as containing more grams of protein than they actually contain causes the Products to command a price premium in the market as compared with similar products that do not make such misrepresentations;

e.  Whether Defendant's advertising and marketing regarding the Products sold to the class members was likely to deceive reasonable consumers;

f.  Whether representations regarding the number of grams of protein in the Products are material to a reasonable consumer;

g.  Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

h.  The amount of profits and revenues earned by Defendant as a result of the conduct;

i.  Whether class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j.  Whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

83.  Typicality: Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each member of the Class were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

84.  Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the class. By prevailing on their own claims, Plaintiffs will establish Defendant's liability to all class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and

Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

85.     Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

86.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

Plaintiffs do not plead, and hereby disclaims, any causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## PLAINTIFFS' FIRST CAUSE OF ACTION
### (Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq.*)
### On Behalf of Plaintiffs and the Class

87.     Plaintiffs reallege and incorporate the paragraphs of this Class Action Complaint as if set forth herein.

88.     Defendant's actions, representations and conduct have violated, and continue to

violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

89.     Plaintiffs and other class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

90.     The Products that Plaintiffs (and other similarly situated class members) purchased from Defendant were "goods" within the meaning of California Civil Code § 1761(a).

91.     Defendant's acts and practices, set forth in this Class Action Complaint, led customers to falsely believe that the Products contained and provided the amount of protein claimed on the product package. By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendant has violated, and continue to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), Defendant's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Defendant's acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendant's acts and practices constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendant has disparaged the goods, services, or business of another by false or misleading representation of fact. In violation of California Civil Code §1770(a)(9), Defendant has advertised goods or services with intent not to sell them as advertised. Finally, regarding California Civil Code §1770(a)(8), Defendant falsely or deceptively markets and advertises that, unlike other protein product manufacturers, it sells Products that contain more grams of protein than the Products actually contain.

92.     Plaintiffs request that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs and the other members of the Class will continue to suffer harm. Plaintiffs and

those similarly situated have no adequate remedy at law to stop Defendant's continuing practices.

93.     Plaintiffs provided Defendant with notice and demand that Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Defendant failed to do so in that, among other things, it failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendant's acts and practices.

94.     Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

**PLAINTIFFS' SECOND CAUSE OF ACTION**
**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Plaintiffs and the Class**

95.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

96.     Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

97.     Defendant made representations and statements (by omission and commission) that led reasonable customers to believe that the Products that they were purchasing contained more grams of protein per serving than the Products actually contained or provided.

98.     Plaintiffs and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing Defendant's Products or paying less for them.

99.     Defendant's acts and omissions are likely to deceive the general public.

100.     Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

101.     The aforementioned practices, which Defendant used, and continues to use, to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

102.     As a direct and proximate result of such actions, Plaintiffs and the other class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

103.     Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon. Plaintiffs and those similarly situated lack any adequate remedy at law to obtain this restitution.

104.     Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

105.     Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it is not entitled. Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law

to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### PLAINTIFFS' THIRD CAUSE OF ACTION
**(Common Law Fraud, Deceit and/or Misrepresentation)**
**On Behalf of Plaintiffs and the Class**

106.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

107.    Defendant has fraudulently and deceptively informed Plaintiffs that the Products contain more grams of protein than they actually contain or provide.

108.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendant, not reasonably known to Plaintiffs, and material at the time they were made. Defendant knew or should have known the composition of the Products, and knew or should have known that the Products did not contain or provide the amount of protein represented on the label. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase Defendant's Products. In misleading Plaintiffs and not so informing Plaintiffs, Defendant breached its duty to them. Defendant also gained financially from, and as a result of, its breaches.

109.    Plaintiffs and those similarly situated relied to their detriment on Defendant's misrepresentations and fraudulent omissions. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

110.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, purchase the Products.

111.    Plaintiffs and those similarly situated justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant.

112.    As a direct and proximate result of Defendant's misrepresentations and/or

omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

113.    Defendant's conduct as described herein was wilful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

**PLAINTIFFS' FOURTH CAUSE OF ACTION**
**(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.*)**
**On Behalf of Plaintiffs and the Class**

114.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

115.    Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continue to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

116.    In particular, Defendant has engaged, and continue to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations cited above, which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

117.    In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, misrepresenting that the Products contain and provide more grams of protein than they actually contain or provide.

118.    Plaintiffs and those similarly situated relied to their detriment on Defendant's unlawful, unfair, and fraudulent business practices. Had Plaintiffs and those similarly situated

been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

119.   Defendant's acts and omissions are likely to deceive the general public.

120.   Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

121.   The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

122.   As a direct and proximate result of such actions, Plaintiffs and the other class members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the class members lost the amount they paid for the Products.

123.   As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

124.   Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiffs, the general public, or those similarly situated by means of the deceptive and/or unlawful trade practices complained of herein, plus interest thereon. Plaintiffs and those similarly situated lack any adequate remedy at law to obtain this restitution.

125.   Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

126.   Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by

order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**PLAINTIFFS' FIFTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**On Behalf of Plaintiffs and the Class**

127.     Plaintiffs reallege and incorporates by reference all paragraphs alleged herein.

128.     Plaintiffs and Class members conferred a benefit on the Defendant by purchasing the Products.

129.     Defendant has been unjustly enriched in retaining the revenues from Plaintiffs' and Class Members' purchases of the Products, which retention is unjust and inequitable, because Defendant falsely represented that the Products contained and provided specific amounts of protein per serving, when, in fact, the Products contained less protein than represented, and provided even less. This harmed Plaintiffs and members of the class because they paid a price premium as a result.

130.     Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court. Plaintiffs and those similarly situated have no adequate remedy at law to obtain this restitution.

131.      Plaintiffs, therefore, seeks an order requiring Defendant to make restitution to them and other members of the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgement against Defendant as follows:

Class Action Complaint

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    An award of compensatory damages in an amount to be determined at trial, except for those causes of action where compensatory damages are not legally available;

D.    An award of statutory damages in an amount to be determined at trial, except for those causes of action where statutory damages are not legally available;

E.    An award of punitive damages in an amount to be determined at trial, except for those causes of action where punitive damages are not legally available;

F.    An award of treble damages, except for those causes of action where treble damages are not legally available;

G.    An award of restitution in an amount to be determined at trial;

H.    An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

I.    For reasonable attorneys' fees and the costs of suit incurred; and

J.    For such further relief as this Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs hereby demand a trial by jury.

Dated: September 22, 2021                    **GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier/s/*
Seth A. Safier, Esq.
Marie McCrary, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111

**EXHIBIT A**

I, Molly Brown, declare:

1.      I am a Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Code of Civil Procedure section 2215.5 and California Civil Code section 1780(d).

3.      As set forth in my complaint, I purchased MorningStar Veggie Burger Grillers Original, MorningStar Popcorn Chik'n, MorningStar Chorizo Crumbles, MorningStar Grillers Prime Veggie Burgers, MorningStar Garden Veggie Burger, MorningStar Grillers Veggie Crumbles, MorningStar Buffalo Chik'n Patties, MorningStar Chik'n Strips, MorningStar Veggie Meatballs, MorningStar Breakfast Veggie Sausage Links, MorningStar Veggie Classics Frozen Buffalo Wings, MorningStar Incogmeato 100% Plant Protein Plant-Based Ground, RX Protein Bars, Special K Protein Original Cereal, and Bear Naked Honey Almond Granola from various Safeway and Target stores throughout Marin County, California since July 2018.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 20th day of September 2021, in Novato, California.



Molly Brown

DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION